# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**COLLEEN A. GLYNN,**
**CHRISTOPHER P. WELLING**
in their capacity as Trustees and
Fiduciaries of ERISA Plans,

and **DOUGLAS C. ANDERSON,**
on his own behalf and on behalf
of others similarly situated,

   Plaintiffs,

vs.

**MARTIN SPORTS & ENTERTAINMENT, LLC,**
**DAVID MARTIN** and **THERESA MARTIN,**

   Defendants.

Case No. 1:19-cv-12189-IT

## DECLARATION OF THERESA MARTIN

1. I, Theresa Martin, am an administrative assistant for Martin Sports and Entertainment, LLC ("Martin Sports"), and in this capacity, I have personal knowledge of the matters articulated below.

2. Martin Sports is a Michigan limited liability corporation engaged in the sports promotion business. It conducts sports promotion events for various professional sports teams which are its customers at various locations around the county. My husband, David Martin, is its sole member or owner and its President and CEO.

3. Martin Sports does not employ on a permanent basis its own hourly paid work force for installation and removal of stages and other equipment used for its sports promotion events at various locations around the county. Instead, it typically retains stagehands and other labor for this purpose on a casual and event by event basis. They are recruited by Martin Sports through help wanted advertisements or referred to it by various local unions around the county which are affiliated with International Alliance of Theatrical Stage Employees ("IATSE") and with which Martin Sports has established referral relationships.

4. I assist with scheduling and retention of such labor.

5. IATSE affiliated unions have typically referred stagehands and other labor to Martin Sports for its events on a casual and event by event basis at regular or straight time hourly wage rates without a requirement that Martin Sports bargain over, enter into, or abide by the terms of collective bargaining agreements with the local unions.

6. On May 9, 12, 27 and 29, Martin Sport produced Boston Bruins' Fan Fest events before the Boston Bruins' hockey playoff home games.

7. Consistent with past practice between Martin Sports and IATSE affiliated unions, on May 8, 2019, I contacted Colleen Glynn, a business agent for Local 11, and requested that the Local refer a crew of 10 stagehands to Martin Sports to work an 8 hour shift at regular or straight time wage rates beginning at 9 a.m. on May 9, 2019, to install a stage for a Bruins Fan Fest event. I understood from our communications that Ms. Glynn had acknowledged and accepted these terms of the stagehand referral on behalf of Local 11.

8.   During the morning on May 9, 2019, Ms. Glynn sent what she described as a "standard one time agreement" to me for me to sign ostensibly as confirmation of the referral arrangement between Martin Sports and Local 11. Ms. Glynn did not disclose any inconsistencies between the agreement and the terms of the stagehand referral acknowledged and accepted by her on behalf of Local 11. She also did not invite me or any authorized representative of Martin Sports to engage in or engage any Martin Sports representative in bargaining of any kind pertaining the terms of the agreement.

9.   I signed the agreement and returned it to Ms. Glynn during early afternoon on May 9, 2019, based on Ms. Glynn's representations to and communications with me. I did so without authorization from my husband and although he had not reviewed or accepted any terms of the agreement as Martin Sports' owner.

10.   Later, on May 9, 2019, I sent an email to Ms. Glynn and requested that she refer a different 6-person crew to work a 4-hour shift at regular or straight time wage rates beginning at 10:30 p.m. on May 9, 2019, to remove the Fan Fest stage because of a police department requirement. I understood from our communications that Ms. Glynn had acknowledged and accepted these terms of the stagehand referral on behalf of Local 11.

11.   Crews allegedly referred by Local 11 to Martin Sports performed the Bruin Fan Fest stage installation and removal on May 9, 2019.

12. During the period between May 10-11, 2019, I contacted Ms. Glynn and requested that Local 11 refer a 10-person crew on May 12, 2019, beginning at 8 a.m. for a 4 to-5 hour shift at regular or straight time wage rates for another Bruins Fan Fest stage installation and a different 10-person crew of 10 beginning at 6 p.m. on May 12, 2019, for a 4 hour shift at regular or straight time wage rates to remove the stage. I also advised Ms. Glynn that Martin Sports had a limited budget with no ability to pay overtime rates and that Ms. Glynn should let her know if this was problematic. I understood from our communications that Ms. Glynn had acknowledged and accepted these terms of the stagehand referral on behalf of Local 11.

13. Crews allegedly referred by Local 11 performed the Fan Fest stage installation and removal on May 12, 2019.

14. None of the stagehands allegedly referred by Local 11 provided Martin Sports with contact information and timesheets of any kind pertaining to their work hours on May 9 and 12, 2019. This information presumably was retained by Local 11 or its payroll company, Art Payroll.

15. On May 20, 2019, Martin Sports was sent an invoice from Art Payroll in the amount of $24, 581.86 for the May 9 and 12, 2019 Bruin Fan Fest stage installations and removals. The invoice disclosed that Martin Sports was billed for excessive contributions to Local 11 fringe benefit plans and for excessive wages attributed to work allegedly performed by crew members allegedly referred by Local 11; that it was billed for many alleged work

hours at one and a half or double the regular wage rates applicable to the various job classifications; and that it was billed for many hours when stagehands did not actually perform work.

16. In particular, contrary to what I requested on May 8, 2019, for work performed on May 9, 2019, Art Payroll billed Martin Sports for: 4 stagehands who purportedly worked at straight time wage rates for 8 hours; 4 who purportedly worked at straight time wage rates for 6 hours and 2 hours at double time; and 6 who purportedly worked at straight time wage rates for 14 hours and double time for 2 hours. Martin Sports was erroneously billed for 160 work hours instead of the 104 work hours needed for the May 9, 2019 stage installation and removal.

17. The May 20, 2019 invoice also evinced, contrary to what I requested on May 10-11, 2019, for work performed on May 12, 2019, that Art Payroll billed Martin Sports for 12 people who purportedly worked 8 hours at time and a half and 4 people who purportedly worked 16 hours at time and a half. Martin Sports was erroneously billed for 240 hours instead of the 80 to 90 hours needed for the May 12, 2019 stage installation and removal.

18. On May 25, 2019, I contacted Ms. Glynn and requested that Local 11 refer a crew of 6 stagehands and 1 fork lift driver beginning at 7 a.m. on May 27, 2019, for a 5 hour shift at straight time rates for Fan Fest stage installation and a crew of 6 stagehands and 1 fork lift driver beginning at 8 p.m. on May 27, 2019, for a 4 hour shift at straight time rates for Fan Fest stage removal. I advised Ms. Glynn that the budget for these services was limited

to $5000. I understood from our communications that Ms. Glynn had acknowledged and accepted these terms of the stagehand referral on behalf of Local 11.

19. On May 28-29 2019, I contacted Ms. Glynn requesting that Local 11 refer a crew of 6 stagehands and 1 fork lift driver beginning at 8 a.m. on May 29, 2019, for a 5 hour shift at straight time wage rates for Fan Fest stage installation and a crew of 6 stagehands and 1 fork lift driver beginning at 8 p.m. on May 29, 2019, for a 4 hour shift at straight time wage rates for Fan Fest stage removal. I advised Ms. Glynn that the budget for these services was limited to $5000. I understood from our communications that Ms. Glynn had acknowledged and accepted these terms of the stagehand referral on behalf of Local 11.

20. Crews allegedly referred by Local 11 performed the Fan Fest stage installation and removal on May 27 and 29, 2019.

21. None of the stagehands allegedly referred by Local 11 provided Martin Sports with contact information and timesheets of any kind pertaining to their work hours on May 27 and 29, 2019. This information presumably was retained by Local 11 or its payroll company, Art Payroll.

22. On June 4, 2019, Martin Sports was sent an invoice from Art Payroll in the amount of $10,794.09 for the May 27 and 29, 2019 Fan Fest stage installations and removals. The invoice disclosed that Martin Sports was billed for excessive contributions to Local 11 fringe benefit plans and for excessive wages attributed to work allegedly performed by crew

members allegedly referred by Local 11; that it was billed for many alleged work hours at one and a half or double the regular wage rates applicable to the various job classifications; and that it was billed for many hours when stagehands did not actually perform work.

23.    In particular, contrary to what I requested on May 25, 2019, for work performed on May 27, 2019, Art Payroll billed Martin Sports for: 2 stagehands who purportedly worked at time and a half for 5 hours and 5 who purportedly worked at time and a half for 9 hours. Martin Sports was erroneously billed for 82.5 hours instead of the 63 hours needed for the May 27, 2019 stage installation and removal.

24.    The June 4, 2019 invoice also evinced, contrary to what I requested on May 28-29, 2019, for work performed on May 29, 2019, that Art Payroll billed Martin Sports for: 5 stagehands who purportedly worked at time and a half for 4 hours and 5 who purportedly worked at straight time wage rates for 8 hours. Martin Sports was erroneously billed for 70 hours instead of the 63 hours needed for the May 29, 2019 stage installation and removal.

25.    My husband asked me to send notice to Local 11 on June 4, 2019, that Martin Sports was terminating the alleged agreement sent by Ms. Glynn to me on May 9, 2019. The notice was sent because my husband never authorized me to sign and he had not accepted the terms of the alleged collective bargaining agreement; he was not given the opportunity to bargain over the terms of the alleged agreement as the owner of Martin Sports; Local 11 or Art Payroll overcharged Martin Sports for costs of labor contrary to communications between my me and Ms. Glynn and Martin Sports' understanding of and expectations related

to the referral arrangement with Local 11; and Local 11 and/or Art Payroll refused to provide invoices to Martin Sports for costs of labor that comport with Martin Sports' understanding of and expectations related to the referral arrangement with Local 11.

**Theresa Martin** states under the penalty of perjury that the foregoing is true and correct.

*[signature]*

**Theresa Martin**

Executed on January 24, 2020