UNTIED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

*******************************************************
**COLLEEN A. GLYNN, CHRISTOPHER P. WELLING**

    In their capacity as Trustees and
    Fiduciaries of ERISA Plans

and

**DOUGLAS C. ANDERSON**,

    On his own behalf and on behalf
    of others similarly situated,

    Plaintiffs,

vs.

**MARTIN SPORTS & ENTERTAINMENT, LLC**,
**DAVID MARTIN and THERESA MARTIN**,

    Defendants.
*******************************************************

Case 1:19-cv-12189-IT

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
DISMISSAL OF PLAINTIFFS' COMPLAINT**

**INTRODUCTION**

On four days in May 2019, forty-four (44) individuals performed services for Martin Sports & Entertainment, LLC ("Martin Sports") associated with Martin Sports' presentation of the for-profit Boston Bruins' Fan Fest. Martin Sports failed to pay a single dollar to any of these individuals and now claims that this Court lacks jurisdiction to provide these individuals a remedy both directly, via a claim for the unpaid wages, and indirectly via claims brought by ERISA plans seeking unpaid contributions. As set out in detail below, Plaintiffs' claims are not preempted by

1

the National Labor Relations Act ("NLRA") or Section 301 of the Labor Management Relations Act ("LMRA").

## BACKGROUND

IATSE, Local 11 ("Local 11") is a labor organization that represents stagehands performing work mostly in Eastern Massachusetts. Among other responsibilities, Local 11 operates a hiring hall from which stagehands who perform work covered by Local 11 collective bargaining agreements are referred. Local 11 has numerous collective bargaining agreements covering worked performed in venues such as the Citizens Bank Opera House, The Boch Wang Theatre, T.D Garden, Gillette Stadium, etc. Local 11 also enters into collective bargaining agreements under which stagehands will be referred to provide stagehand work to presenters that do not have a regular presence within the jurisdiction of Local 11. Local 11 refers to these agreements as "One-Time Agreements," although, in many instances, such agreements apply to multiple performances by the presenter. At all times material, Colleen A. Glynn ("Business Manager Glynn") was the Business Manager of Local 11 and, in that capacity, oversaw the day-to-day operation of Local 11, including the operation of the hiring hall. *Affidavit of Colleen A. Glynn in Support of Plaintiffs' Opposition to Defendants' Motion for Dismissal of Plaintiffs' Complaint ("Glynn Affidavit")*, ¶¶1, 2.

In May 2019, Business Manager Glynn was contacted by Theresa Martin ("VP Martin") who identified herself as the Vice President of Martin Sports. In that conversation, VP Martin informed Business Manager Glynn that Martin Sports needed stagehands to do the stage installation and related work associated with Martin Sports' production of Boston Bruins' Fan Fest. During that conversation, Business Manager Glynn discussed generally with VP Martin how the referral process would work, including the fact that Martin Sports would sign a "Standard One-

Time Agreement" setting out the terms and conditions under which the stagehands would work. Subsequently, on May 8, 2019, Business Manager Glynn forwarded to VP Martin the "Contract Between Martin Sports and The International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts I.A.T.S.E. Local 11." VP Martin signed the contract as VP of Martin Sports. As indicated in the header of the document, *i.e.*, Agreement between IATSE, Local 11 and Martin Sports 2019, and consistent with Business Manager Glynn's discussions with VP Martin, the agreement was to apply to the Fan Fests to be produced by Martin Sports during 2019, including the Fan Fests scheduled for May 9, 12, 27 and 29, June 6 and 12, and October 12 and 14, 2019. *Glynn Affidavit*, ¶¶3-5.

At the request of Martin Sports, Local 11 stagehands were referred to Martin Sports on May 9, 12, 27 and 29; and the stagehands performed the stagehand work needed for Martin Sports to produce the Boston Bruins' Fan Fest on those dates. On or about May 27, 2019, Business Manager Glynn spoke with VP Martin regarding the fact that May 27 was a holiday, which would have required Martin Sports to pay a premium to the stagehands who worked on that date. During that conversation, Business Manager Glynn agreed to waive the holiday pay provision for May 27. On May 28, 2019, Business Manager Glynn received an email from VP Martin requesting additional concessions, *i.e.*, changing the minimum call from 8 hours to 4 hours and waiving the 8-hour period between calls. Later that day, Business Manager Glynn sent VP Martin an email stating, in part, that Local 11 would waive the 8 hour turn around and invoice the load out as 4 hours at time and one half. *Glynn Affidavit*, ¶¶6-8.

As noted *supra*, stagehands referred from the Local 11 hiring hall worked for Martin Sports in association with the May 29 Boston Bruins' Fan Fest. After the load in and set up on May 29, VP Martin sent Business Manager Glynn another email indicating that Martin Sports wanted

3

further concessions. Business Manager Glynn did not respond to that email as Local 11 already had made substantial concessions for Martin Sports. Other than the concessions Business Manager Glynn made regarding the May 27 and 29 work calls, Business Manager Glynn never agreed to contract terms other than the terms set out in the contract. Even though Martin Sports had the benefit of the work of Local 11-referred stagehands, Martin Sports never paid the stagehands any amount for their services rendered. *Glynn Affidavit*, ¶¶9, 11.

## THE COMPLAINT

The instant action has been brought, in part, by Colleen A. Glynn and Christopher P. Welling in their respective capacities as fiduciaries of three Taft-Hartley Funds into which Martin Sports was obligated to contribute under the terms of the contract. Their action for unpaid contributions has been brought under ERISA Sections 502(e)(1) and 515. The instant action also was brought by Douglas C. Anderson, one of the forty-four (44) stagehands who provided services to Martin Sports for which Martin Sports never paid. Plaintiff Anderson's claim has been brought under Massachusetts General Laws Chapter 149, Section 150 and claims that Martin Sports and David Martin and Theresa Martin violated Massachusetts General Laws Chapter 149, Section 148. Plaintiff Anderson's claim has been brought on his own behalf and on behalf of similarly situated stagehands.

## ARGUMENT

### A. The Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims As Those Claims Are Not Preempted By The NLRA.

In arguing that the Plaintiffs' claims are preempted by National Labor Relations Act ("NLRA"), the Defendants quote boilerplate principles such as the NLRA "is a comprehensive code passed by Congress to regulate labor relations in activities affecting interstate and foreign commerce" … which "vests the NLRB with exclusive jurisdiction to resolve issues pertaining

whether employees wish to be represented by a union, identification of an appropriate collective-bargaining unit, certification of an exclusive bargaining agent" (*Brief in Support of Defendants' Motion for Dismissal of Plaintiffs' Complaint* at pp. 11 & 12), and then, without citation to any specific decisions, argue, summarily and incorrectly, that all the Plaintiffs' claims must be dismissed because this Court lacks subject matter jurisdiction to decide the merits of any of the Plaintiffs' claims because "this Court will have to determine whether Local 11 was a duly certified bargaining representative under either section 8(f) or 9(a) of the NLRA for the stagehands who performed work for Martin Sports at Bruin Fan Fest events held on May 9, 12, 27, and 29, 2019, and whether Ms. Glynn's mere forwarding of the proposed collective bargaining agreement to Martin Sports was sufficient to demonstrate that it also complied with its obligation to bargain in good faith with Martin Sports as required by sections 8(b)(3) and 8(d) of the NLRA…." *Id*. at p. 14.  As set out below, Defendants' NLRA preemption argument is without merit.

1. <u>The Court has Subject Matter Jurisdiction to Decide Plaintiff Glynn's and Welling's Claims for Delinquent Contributions Which are not Preempted by the NLRA.</u>

In 1980, Congress amended ERISA by adding ERISA Section 515 to provide a direct and unambiguous cause of action against delinquent employers such as Martin Sports.[1]  In actions brought under Section 515, employers are not entitled to raise defenses such as those raised by Martin Sports, *i.e.*, that the underlying contract is not enforceable because Local 11 was not the duly certified bargaining representative of the stagehands that worked for Martin Sports and/or that Local 11 failed to bargain in good faith with Martin Sports in arriving at that contract.

---

[1] ERISA Section 515 states:

"Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

In this regard, in *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314-16 (2nd Cir. 1990), the Second Circuit, explaining the scope of ERISA Section 515, held as follows:

> First, we are doubtful that an abandoned agreement must be deemed non-existent. Abandonment is an NLRB doctrine by which an outside union seeking to represent employees may defeat the claim of the employer and incumbent union that an existing collective bargaining agreement acts as a bar to the outside union's petition for representation. *See, e.g., Austin Powder Co.*, 201 N.L.R.B. No. 90, 82 L.R.R.M. 1272, 1273 (1973); *Raymond's, Inc.*, 161 N.L.R.B. No. 80, 63 L.R.R.M. 1363, 1364 (1966). In other words, an abandoned collective bargaining agreement will not bar the outside union's petition because the NLRB "cannot honor that contract as one imparting sufficient stability to the bargaining relationship to justify [the NLRB's] withholding a present determination of representation." *Raymond's, Inc.*, 63 L.R.R.M. at 1364 (footnote omitted). Thus, an NLRB determination of abandonment means only that the "contract bar" rule will not apply. "The 'contract bar' doctrine is a prudential concept used by the Board for representational election purposes only." *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 172 (2d Cir. 1984), *cert. denied*, 469 U.S. 1212, 84 L. Ed. 2d 329, 105 S. Ct. 1181 (1985). A determination that a contract does not bar an election "is not equivalent to a holding that for all purposes there is no valid written agreement." *Id.*
>
> Second, assuming that abandonment means no valid written agreement exists, Brower's is not released from its obligation to the Funds because "nothing in ERISA makes the obligation to contribute [to a benefit plan] depend on the existence of a valid collective bargaining agreement." *Gerber Truck*, 870 F.2d at 1153. Lest there be any doubt on this point, we shall briefly return to the legislative history.
>
> Representative Thompson, the manager of the legislation in the House, stated:
>
>> Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.
>>
>> In this regard we endorse judicial decisions such as *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 4 L. Ed. 2d 442, 80 S. Ct. 489 (1960). . . . Cases such as *Western Washington Laborers-Employers Health and Security Trust Fund v. McDowell*, . . . 103 LRRM 2219 (W. D. Wash., 1979) and *Washington Area Carpenters Welfare Fund, et al. v. Overhead Door Company*, [488 F. Supp. 816 (D.D.C. 1980)], are considered to have been incorrectly decided and this legislation is intended to clarify the law in this respect by providing a direct, unambiguous ERISA cause of action to a plan against a delinquent employer.
>
> 126 Cong. Rec. 23,039 (1980).
>
> Both *McDowell* and *Overhead Door* involved "pre-hire" agreements, which are agreements commonly executed by employers in the construction business. By signing a

6

pre-hire agreement an employer agrees to abide by the terms of a collective bargaining agreement as soon as he hires his employees. At the time that these two cases were decided, pre-hire agreements were valid and enforceable only if a majority of the workers hired ultimately wished to be represented by the union. *See* NLRB v. Local Union No. 103, Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 98 S. Ct. 651, 54 L. Ed. 2d 586 (1978). The employers in *McDowell* and *Overhead Door* sought to escape liability to the benefit plans by arguing that their pre-hire agreements were invalid because the unions had failed to attain majority status, and therefore no obligation to contribute to the benefit plans existed. The benefit plans argued that the employers could not raise such a defense.

Both courts permitted the employers to maintain their defenses and ruled in favor of the employers. The court in *Overhead Door* stated: "[The cases cited by the Funds] involved collateral defenses to enforcement of the agreements. The defense in the instant case, on the other hand, concerns the validity of the very agreement that sought to establish a contractual relationship between Funds and Overhead." 488 F. Supp. at 819. Brower's argument is identical to the one accepted in *Overhead Door* and *McDowell*, and Congress clearly intended to forbid it. In light of this unmistakably clear legislative intent, we need not devote any separate discussion to Brower's argument that it may raise lack of majority status as a defense.

We recognize that the result in this and similar cases may seem quite harsh. Brower's now must contribute to the Funds without a preliminary determination that there exists a collective bargaining agreement that would be recognized as valid under labor-management relations law. Our task today, however, is merely to enforce Congress' desire that benefit plans be able to rely on the written agreements presented to them. We note that an employer's liability in this situation is not limitless because an employer is liable under section 515 only for the effective period of the collective bargaining agreement. *See* Advanced Lightweight, 484 U.S. at 548-49.

As noted above, the NLRB's determination that the most recent collective bargaining agreement between Brower's and Local 814 is valid will shortly be reviewed by this Court. We agree with the district court, however, that the issues raised in that litigation have been legislatively removed from the present action. We note that a district court may, in its discretion, choose to stay its proceedings pending an NLRB determination with respect to the collective bargaining agreement if the stay would serve the interests of fairness, efficiency and judicial economy without impairing the legislative intent underlying ERISA section 515. *See, e.g.,* Painters' Pension Trust Fund v. Manganaro Corp., 693 F. Supp. 1222, 1224-25 & n. 2 (D.D.C. 1988). Should this Court overturn the NLRB's decision, Brower's may seek appropriate relief from the district court's judgment. We express no opinion on whether any relief is available or on what form it might take because those issues are not before us. The Funds need not await the outcome of the litigation between Brower's and the union, however, because that is the precise evil that Congress sought to avoid in enacting ERISA section 515. …

CONCLUSION

ERISA section 515, 29 U.S.C. § 1145, prohibits Brower's from raising as a defense either the union's abandonment of the collective bargaining agreement containing Brower's promise to contribute to the Funds, or the union's alleged lack of majority status.

*See also e.g., New Bedford Fishermen's Welfare Fund v. Baltic Enterprises, Inc.*, 813 F.2d 503, 505 (1st Cir. 1987) ("ERISA section 502, 29 U.S.C. § 1132(a) (3), is an exception to the general rule that federal courts must always defer to the Board's determination. It authorizes multiemployer benefit funds to sue employers directly in federal district court to collect delinquent contributions due under section 515."); *Laborers Health & Welfare Trust Fund v. Kaufman & Broad, Inc.*, 707 F.2d 412, 415-416 (9th Cir. 1983) ("There is authority for holding that the primary jurisdiction rationale is inapplicable where the injured party bringing the suit has no acceptable means to invoke the Board's jurisdiction and cannot induce its adversary to do so. *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 201-02, 56 L. Ed. 2d 209, 98 S. Ct. 1745 (1978). In such circumstances, the action is ordinarily cognizable in an otherwise appropriate judicial forum."); *Central States, Southeast & Southwest Areas Pension Fund v. Old Dutch Foods*, 968 F. Supp. 1292, 1297 (N.D. Ill. 1997) ("Old Dutch contends that summary judgment is appropriate because the district court's jurisdiction is preempted by the NLRA. Old Dutch cites several cases that state that federal courts generally do not have jurisdiction over representational issues, such as who is included in the "collective bargaining unit." *See i.e., Local 703, Int'l Brotherhood of Teamsters v. Kennicott Bros.*, 725 F.2d 1088 (7th Cir. 1982); *Local No. 3-193 International Woodworkers of America v. Ketchikan Pulp Company*, 611 F.2d 1295 (9th Cir. 1980); *Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Willett*, 614 F. Supp. 932 (N.D. Ill. 1985). Old Dutch argues that this court does not have jurisdiction to determine what makes up the collective bargaining unit. It states this

question is reserved under the NLRA for the NLRB. However, in the ERISA context, this argument is misplaced.")

As noted *supra*, Defendants has not cited a single decision wherein a court ruled that it lacked subject matter jurisdiction to decide a case involving a claim brought pursuant to ERISA Section 515. Of course, such a decision does not exist given that ERISA Section 502(e)(1) grants to this Court exclusive jurisdiction to hear claims for delinquent contributions brought under ERISA Section 515.[2] In addition, as detailed by the Second Circuit Court of Appeals in *Benson*, Congress enacted ERISA Section 515 to foreclose the same arguments that Martin Sports is making in this matter more than 40 years later.[3]

### 2. The Court has Supplemental Jurisdiction to Decide Plaintiff Anderson's Claims Which are not Preempted by the NLRA.

Plaintiff Anderson's Massachusetts Wage Act claim, brought on his own behalf and on the behalf of similarly situated stagehands who were not paid by Martin Sports, or any other claims for unpaid wages such as a third-party breach of contract claim could not have been brought by

---

[2] ERISA Section 502(e)(1), in relevant part, states:

"Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title."

[3] Interestingly, Martin Sports could have, but chose not to challenge the validity of the contract by filing a charge with the NLRB under the NLRA. The filing of such a charge would not initially change the results in this matter but, depending on the outcome of that charge, could have provided the predicate for seeking "appropriate relief from the district court." *Benson*, 907 F.2d at 316. Having failed to file such a charge, Martin Sports waived its right to challenge the validity of the contract in this case as well as the companion case, IATSE, Local 11 v. Martin Sports. *See, e.g., William E. Arnold Co. v. Carpenters District Council*, 417 U.S. 12, 16 (1974) ("When an activity is either arguably protected by §7 or arguably prohibited by §8 of the NLRA, the preemption doctrine developed in … *Garmon* … and its progeny, teaches that ordinarily 'the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.' … When, however, the activity in question also constitutes a breach of a collective bargaining agreement, the Board's authority 'is not exclusive and does not destroy the jurisdiction of the courts in suits under §301.' … This exception was explicitly reaffirmed in *Motor Coach Employees v. Lockridge* …. It was fashioned because the history of §301 reveals that 'Congress deliberately chose to leave the enforcement of collective bargaining agreements 'to the usual processes of law'… Thus, we have said that the *Garmon* doctrine is 'not relevant' to actions within the purview of §301, … which may be brought in either state or federal courts.")

Anderson under the NLRA. Thus, the challenged activity in this case, *i.e.*, Martin Sports' failure to pay its employees for their service, is "not arguably subject to §7 or §8 of the [NLRA]" as described in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244 (1959). This fact notwithstanding, Defendants circularly argue, again without citation to any decisions, that this Court cannot grant Anderson relief without determining that the underlying contract, unchallenged by Martin Sports under the NLRA, was valid under the NLRA, which the Court cannot do since the determination of whether the contract was valid under the NLRA lies in the sole province of the NLRB. This circular argument, if accepted by the Court, would deprive Plaintiff Anderson and his fellow stagehands any recovery for unpaid wages. Further, given that Local 11's claims for breach of contract brought under §301 are not preempted under *Garmon* (see footnote 3), wage claims that are based on the terms set out in that contract should similarly not be preempted under *Garmon*, particularly since such claims could not be brought by Anderson under the NLRA. *See, e.g., Laborers Health & Welfare Trust Fund v. Kaufman & Broad, Inc.*, *supra* ("There is authority for holding that the primary jurisdiction rationale is inapplicable where the injured party bringing the suit has no acceptable means to invoke the Board's jurisdiction and cannot induce its adversary to do so. *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 201-02, 56 L. Ed. 2d 209, 98 S. Ct. 1745 (1978). In such circumstances, the action is ordinarily cognizable in an otherwise appropriate judicial forum.")

    **B. Plaintiff Anderson's Claims Are Not Preempted By LMRA Section 301.**

In the instant case, Defendants do not dispute that they owed wages to Plaintiff Anderson and his fellow stagehands and that they did not pay those wages. *See Declaration of Theresa Martin*, ¶16 ("Martin Sports was erroneously billed for 160 work hours instead of the 104 work hours needed for the May 9, 2019 stage installation and removal."); ¶23 ("Martin Sports was

erroneously billed for 82.5 hours instead of the 63 hours needed for the May 27, 2019 stage installation and removal."); and ¶24 ("Martin Sports was erroneously billed for 70 hours instead of the 63 hours needed for the May 29, 2019 stage installation and removal.").

In addition, Defendants do not contend that the invoices sent to them by the payroll company were based on an incorrect application of the terms of the written contract as concededly modified by Business Manager Glynn. Rather, Defendants contend that Business Manager Glynn further orally modified the terms of the contract and that those modifications were not reflected in the invoices that they failed to pay. *See, e.g., id.*, ¶7 ("Consistent with past practice between Martin Sports and IATSE affiliated unions, on May 8, 2019, I contacted Colleen Glynn, a business agent for Local 11, and requested that the Local refer a crew of 10 stagehands to Martin Sports to work an 8 hour shift at regular or straight time wage rates beginning at 9 a.m. on May 9, 2019, to install a stage for a Bruins Fan Fest event. I understood from our communications that Ms. Glynn had acknowledged and accepted these terms of the stagehand referral on behalf of Local 11."); ¶10 ("Later, on May 9, 2019, I sent an email to Ms. Glynn and requested that she refer a different 6-person crew to work a 4-hour shift at regular or straight time wage rates beginning at 10:30 p.m. on May 9, 2019, to remove the Fan Fest stage because of a police department requirement. I understood from our communications that Ms. Glynn had acknowledged and accepted these terms of the stagehand referral on behalf of Local 11."). *See also id*. at ¶¶12, 18, 19, 25.

Accordingly, the issue to be determined in deciding the Wage Act claims does not involve the meaning of the contract. Rather, the issue to be determined is whether and, if so, to what extent, Business Manager Glynn modified orally the written terms of the contract. Once that issue is determined, the only reference to the terms of the contract will be to determine the appropriate measure of damages. The potential need to refer to the terms of the contract to calculate the wages

owed based on undisputed terms of a written contract does not make Plaintiff Anderson's Wage Act claims subject to preemption under LMRA Section 301.

In this regard, the Supreme Court, in *Livadas v. Bradshaw*, 512 U.S. 107, 123-25 (1994), stated as follows:

> In *Lueck* and in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988), we underscored the point that § 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law, to the text of the note and we stressed that it is the legal character of a claim, as "independent" of rights under the collective-bargaining agreement, *Lueck, supra*, at 213 (and not whether a grievance arising from "precisely the same set of facts" could be pursued, *Lingle, supra*, at 410) that decides whether a state cause of action may go forward. Finally, we were clear that when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished, see *Lingle, supra*, at 413, n. 12 ("A collective-bargaining agreement may, of course, contain information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled").
>
> These principles foreclose even a colorable argument that a claim under Labor Code § 203 was pre-empted here. As the District Court aptly observed, the primary text for deciding whether *Livadas* was entitled to a penalty was not the Food Store Contract, but a calendar. The only issue raised by Livadas's claim, whether Safeway "willfully failed to pay" her wages promptly upon severance, Cal. Lab. Code Ann. § 203 (West 1989), was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer. There is no indication that there was a "dispute" in this case over the amount of the penalty to which Livadas would be entitled, and *Lingle* makes plain in so many words that when liability is governed by independent state law, the mere need to "look to" the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301. *See* 486 U.S. at 413, n. 12.

Accordingly, since the Court's only reference to the contract in the instant case will be to calculate damages and since, in making that reference, the Court will not have to interpret the contract, Plaintiff Anderson's Wage Act claim is not preempted by LMRA Section 301.

### C. If Plaintiff Anderson's Wage Act Claims Are Preempted By LMRA Section 301, His Claims Should Be Recast As Section 301 Claims Rather Than Be Dismissed.

The contract in the instant case does not contain a grievance arbitration provision. As such, if the Court, *arguendo*, determines that Plaintiff Anderson's Wage Act claim is preempted by LMRA Section 301, it may recast those claims as claims under Section 301 and allow the claims to proceed at least to recover the wages owed under the contract. *See, e.g., Cefarrati v. JBG Properties, Inc*., 75 F. Supp. 3d 58, 69 (D.C. Dist. 2014) (court declines to recast plaintiff's preempted claims as Section 301 claims where the contract provided for grievance and arbitration procedures and those procedures had not been exhausted").

### CONCLUSION

As noted *supra*, Defendants have not cited and cannot cite a decision in which a court, post-1980, has permitted a defendant to challenge the validity of an underlying collective bargaining agreement in defending an action brought for delinquent contributions under ERISA Sections 502(e)(1) and 515.  Additionally, Defendants have not cited and cannot cite a decision in which the NLRB or a court has ruled that employee claims for unpaid wages can be brought by employees under the NLRA by filing a charge with the NLRB; and, as such, Plaintiff Anderson's Massachusetts Wage Act claim is not preempted by the NLRA.  Further, while the Court may have to refer to the contract to calculate damages, the Court is not being asked to interpret the terms of the contract; and, as such, Plaintiff Anderson's claim for unpaid wages, brought on his own behalf and on behalf of his fellow stagehands, is not preempted by LMRA Section 301.  Finally, since the contract does not contain a grievance arbitration provision, the Court should recast Plaintiff Anderson's Wage Act claim as a Section 301 claim if the Court determines that that claim is preempted by Section 301.

For these reasons, Plaintiffs respectfully requests that the Court deny, in all respects Defendants' Motion to Dismiss.

        Respectfully submitted,

        For the Plaintiffs,

        **COLLEEN GLYNN, CHRISTOPHER WELLING AND DOUGLAS C. ANDERSON,**

        By their Attorney,

        /*Gabriel O. Dumont, Jr.*/
        Gabriel O. Dumont, Jr.
        BBO#137820
        **FEINBERG, DUMONT & BRENNAN**
        177 Milk Street, Suite 300
        Boston, MA 02109
        (617) 338-1976
        Cell (617) 733-4804
        gd@fdb-law.com

September16, 2021