# UNTIED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **COLLEEN A. GLYNN, CHRISTOPHER P. WELLING** | * |
|  | * |
|  | * |
| In their capacity as Trustees and | * |
| Fiduciaries of ERISA Plans | * |
|  | * |
| and | * |
|  | * |
| **DOUGLAS C. ANDERSON**, | * |
|  | * |
| On his own behalf and on behalf | * Case 1:19-cv-12189-IT |
| of others similarly situated, | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| vs. | * |
|  | * |
| **MARTIN SPORTS & ENTERTAINMENT, LLC,** | * |
| **DAVID MARTIN and THERESA MARTIN**, | * |
|  | * |
| Defendants. | * |
|  | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION.

In claiming that they are entitled to summary judgment on Plaintiff Anderson's Wage Act claims, made on his on behalf and on behalf of the other employees of Martin Sports & Entertainment, LLC ("Martin Sports") who were not paid by Martin Sports, Defendants press two legal arguments without citation to any authority.  However, as detailed below, Defendants, in pressing their arguments, ignore the plain language of the Wage Act and disregard the decisions of the Massachusetts Supreme Judicial Court as well as the First Circuit Court of Appeals which

have held, without exception, that the Wage Act imposes strict liability on Defendants such that, the fact that IATSE, Local 11 ("Local 11") stepped in and provided funds from which American Residuals and Talent, Inc. d/b/a ART Payroll (ART Payroll") paid Plaintiff Anderson and the other Local 11-referred employees who were not paid by Martin Sports simply is irrelevant to Plaintiff Anderson's Wage Act claims.

FACTS.

*Defendants' Brief in Support of Their Motion for Summary Judgment* ("*Defendants' Brief*") contains twelve pages of what they characterize as "Undisputed Material Facts." Most of the alleged "Facts" are not material in that, as set out below, the only facts that are material are whether Martin Sports, in fact, paid the Local 11-referred employees for services rendered, which it did not.  In addition, as also set out below, Defendants', in their alleged undisputed "Facts," mischaracterize the plain language in the exhibits they rely on, *e.g.*, Exhibit B, *Talent Payroll Support Agreement between Martin Sports and ART Payroll*, and misstate what their Exhibits show, *e.g.*, Exhibit D, ART Payroll records and *Defendants' Brief* at p.8 ("ART Payroll timely tendered all wages due to the Local 11 members who performed work for Martin Sports on May 9 and 12, 2019 …").

In conjunction with entering its contract with Local 11 for work performed in August 2018, Defendant David Martin, on behalf of Martin Sports, executed the *Talent Payroll Support Agreement* with ART Payroll ("ART Agreement"). *Defendants' Brief*, Exhibit B. Martin Sports was identified as the "Client" under the ART Agreement.  The ART Agreement succinctly described "ART Responsibilities" under the ART Agreement as follows:

> 2.1    ART shall process payroll data timely delivered to it by Client and shall prepare invoices reflecting the payments to be made according to information provided by Client, any applicable Collective Bargaining Agreement and /or personal services contracts and the requirements of applicable law.

2.2     ART shall ensure that all Client-approved talent payments will be made to the Personnel as invoiced, including all the appropriate tax withholdings, and Pension & Health contributions. ART shall make such payments upon receipt of payment by Client.

2.3     ART shall prepare invoices for payroll data accurately completed and timely delivered by Client in accordance with the schedule dictated by specific collective bargaining agreements.

2.4     ART shall act as "employer of record" for purposes of all Federal and State taxes, Unemployment taxes and Workers Compensation Insurance. The insurance afforded by this section is not intended to satisfy Client's duty to secure its obligations under workers compensation laws. ART shall not provide Workers Compensation coverage for the following states: Florida, North Dakota and Utah without advance notice of production in these states. In the event that ART is not able to obtain coverage needed, ART shall not be the employer of record for personnel performing work in these states.

*Defendants' Brief*, Exhibit B, p.2.

The ART Agreement expressly made Martin Sports responsible for paying the actual wages due the Local 11-referred employees and provided for notice in the event Martin Sports disputed the amounts reflected on an invoice:

*3.1     Client agrees to pay ART: (a) the actual wages due to the Personnel, (b) the applicable Pension & Health fees, (c) a fee of 20% of the Personnel wages representing employer's payroll taxes, and (d) a handling fee of 8% of the Personnel wages. In addition, if the Client opts to pay an invoice with a credit card, ART will charge a convenience fee of 2.5% of the invoice total.* (Emphasis in original). …

3.2     Client must notify ART within twenty four (24) hours of receipt of the invoice if Client disputes any item on the invoice. Client and ART agree to work to resolve any disputed items in a prompt manner.

*Defendants' Brief*, Exhibit B, pp.2-3.[1]

Plaintiff Anderson and his fellow Local 11-referred employees provided services to Martin Sports related to the Boston Bruins Fan Fests on May 9 and 12, 2019.  When Martin Sports failed

---

[1] While not material to the Court's consideration of the cross motions for summary judgment, Plaintiffs would note that, during the litigation, Defendants repeatedly characterized the invoices as being inaccurate and have implied that it was not responsible for paying the wages it owed because the invoices were somehow inaccurate.  However, the business records of ART Payroll (*Defendants' Brief*, Exhibit D) do not contain any record of Martin Sports disputing the accuracy of the invoices.

to pay the employees either directly or through ART Payroll, Local 11 stepped in and, on June 14, 2019, paid ART Payroll the amount of the unpaid Martin Sports' invoice, *i.e.*, $24,188.06. *Defendants' Brief*, Exhibit D, p.26; *Affidavit of Colleen A. Glynn*, ¶3.  On that same date, June 14, 2019, ART Payroll issued paychecks to Plaintiff Anderson and the other Local 11-referred employees who worked for Martin Sports on May 9 and/or 12, 2019.  *Defendants' Brief*, Exhibit D, pp.3-4.[2] Local 11-referred employees similarly provided services to Martin Sports related to the May 27 and 29, 2019 Fan Fests and, again, Martin Sports failed to pay the employees for services rendered.  As it had done before, Local 11 stepped in and, on June 21, 2019, paid ART Payroll the amount of the unpaid invoice that related to those services, *i.e.*, $10,621.09. *Defendants' Brief*, Exhibit D, p.32; *Affidavit of Colleen A. Glynn*, ¶4. On that same date, June 21, 2019, ART Payroll issued paychecks to the Local 11-referred employees who worked for Martin Sports on May 27 and/or 29, 2019. *Defendants' Brief*, Exhibit D, pp.2.[3]

**ARGUMENT.**

### **Martin Sports and the Martins are Strictly Liable under the Wage Act.**

In pertinent part, Massachusetts General Laws, c. 149, §148 states:

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week, *or in the case of an employee who has worked for a period of less than five days, hereinafter called a casual employee, shall, within seven days after the termination of such period, pay the wages earned by such casual employee during such period,…*

---

[2] Remarkably, Defendants, in their Brief (footnote 4), state that "ART Payroll records are somewhat inconsistent" regarding when Plaintiff Anderson and his fellow employees were paid.  This assertion ignores the fact that ART Payroll records expressly state that the checks were dated "06/14/2019."

[3] Pension, Annuity Fund and JACET contributions related to the May 9 and 12, 2019 events were paid by ART Payroll on June 20, 2019 (*Defendants' Brief*, Exhibit D, pp.6, 9 & 10), while the contributions related to the May 27 and 29, 2019 events were paid by ART Payroll on June 27, 2019. *Defendants' Brief*, Exhibit D, pp.12, 15 & 16.

> *No person shall by a special contract* with an employee *or by any other means exempt himself from this section or from section one hundred and fifty*. The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section. Emphasis added.

It is well-settled that the Wage Act imposes strict liability on an employer and that employee plaintiffs suffer damages compensable under c. 149, §150 that may not offset by any money that was not paid by an employer in compliance with c. 149, §148.

For example, in *Dixon v. City of Malden*, 464 Mass. 446, 452-53 (2012), the SJC held as follows:

> 3. Failure of proof of damages. The city asserts that the judge properly concluded that G. L. c. 149, § 150, requires a plaintiff to show he suffered actual damages. The city relies on several cases that do not have precedential value to support its argument that damages incurred can be mitigated by payments made after an employee's termination and that the plaintiff must affirmatively show actual damages to succeed in a Wage Act claim. These cases are distinguishable on their facts.

> Contrary to the city's assertion, a violation of the Wage Act results in damages. It is settled law that the Wage Act "impose[s] strict liability on employers." *Somers v. Converged Access, Inc.*, 454 Mass. 582, 592, 911 N.E.2d 739 (2009). Employers must "suffer the consequences" of violating the statute regardless of intent. *Id.* at 591. In these circumstances, the plaintiff has incurred damages under the terms of the statute because the city did not pay his earned, unused vacation time, a definitive amount of $13,615.54, when he was terminated from the city's employment. *See Electronic Data Sys. Corp. (No. 2), supra* at 71; *Wiedmann v. The Bradford Group, Inc.*, 444 Mass. 698, 708, 831 N.E.2d 304 (2005).

Similarly, in *Somers v. Converged Access, Inc.*, 454 Mass. 582, 583-84 (2009), the SJC,

rejecting an argument by the employer that it should be permitted to offset against its unpaid

wages the amount it had paid the employee as an "independent contractor," held as follows:

> We transferred this case here on our own motion to decide whether the "damages incurred" by an individual under §150 for having been misclassified as an independent contractor rather than an employee, in violation of §148B, should be measured by subtracting the compensation the plaintiff obtained as an independent contractor from the compensation the plaintiff would have received had he been hired as an employee. We conclude that this measure of damages contravenes both the plain meaning and the primary purpose of the independent contractor statute and the wage act. An employee misclassified as an independent contractor, as a matter of law, is an employee; his contract rate is his wage

5

rate; and his "damages incurred" equal the value of wages and benefits he should have
received as an employee, but did not. Accordingly, we vacate that part of the judgment that
dismisses count four of the plaintiff's amended complaint.

*See also Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) ("The focal

point of this appeal is the plaintiff's claim under the Wage Act, Mass. Gen. Laws ch. 149, §§

148, 150. First enacted in 1879, the Wage Act was intended 'to protect employees and their right

to wages.' *Elec. Data Sys. Corp. v. Attorney General*, 454 Mass. 63, 907 N.E.2d 635, 641 (Mass.

2009). Of particular pertinence for present purposes, the Wage Act requires an employer to pay

an employee "in full" by the date of discharge. Mass. Gen. Laws ch. 149, § 148. This provision

'impose[s] strict liability on employers,' who must 'suffer the consequences' of non-compliance

regardless of their intent. *Dixon v. City of Malden*, 464 Mass. 446, 984 N.E.2d 261, 265 (Mass.

2013) (*quoting Somers v. Converged Access, Inc.*, 454 Mass. 582, 911 N.E.2d 739, 749 (Mass.

2009)").

In their *Brief*, Defendants argue that ART Payroll was the "employer of record" for

purposes of complying with c. 148, §148 (*Defendants' Brief*, p.18); that ART Payroll had paid

the employees all wages owed them "months before" the instant lawsuit was filed (*id.*, p.19); and

that Defendants could not "compensate the Local 11 members who performed work for Martin

Sports … because neither Local 11 nor ART Payroll provided Martin Sports with contact

information, social security numbers, Form w-4's, and other information it needed to directly

compensate the Local 11 members." *Id*.

Defendants' arguments can be quickly disposed of by reference to the relevant

documents, the statute, and the governing decisions under c. 149, §§148 and 150. First, the ART

Agreement clearly did not make ART the "employer of record" for purposes of complying with

c. 149, §148.  Rather, the ART Agreement, as noted *supra*, stated:

2.4    ART shall act as "employer of record" for purposes of all Federal and State taxes, Unemployment taxes and Workers Compensation Insurance. The insurance afforded by this section is not intended to satisfy Client's duty to secure its obligations under workers compensation laws. ART shall not provide Workers Compensation coverage for the following states: Florida, North Dakota and Utah without advance notice of production in these states. In the event that ART is not able to obtain coverage needed, ART shall not be the employer of record for personnel performing work in these states. …

*3.1    Client agrees to pay ART: (a) the actual wages due to the Personnel, (b) the applicable Union Pension & Health fees, (c) a fee of 20% of the Personnel wages representing employer's payroll taxes, and (d) a handling fee of 8% of the Personnel wages. In addition, if the Client opts to pay an invoice with a credit card, ART will charge a convenience fee of 2.5% of the invoice total.* (Emphasis in original).

*Defendants' Brief*, Exhibit B, pp.2-3.

Second, even if Martin Sports and ART Payroll intended that ART Payroll be the "employer of record" for purposes of c. 149, §148 (which they clearly did not), the ART Agreement would be the type of agreement prohibited under c. 149, §148 ("No person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty."). Third, the fact that the Local 11-referred employees ultimately were paid using Local 11 funds in no way insulates Defendants for liability since any wage payments not made by an employer in compliance with c. 149, §148 cannot be offset against wages owed under c. 149, §148. *See, e.g., Somers v. Converged Access, Inc., supra*. (Amounts improperly paid to an individual as independent contractor compensation cannot be offset against wages owed under c. 149, §148). Fourth, even if the wages paid from the Local 11 funds could be considered by the Court, the wages were paid long after the required time frames had expired. Lastly, while there is no evidence that Defendants ever requested the information that it now claims would have allowed it to comply with c. 149, §148, Defendants' intent simply is of no relevance on the issue of its liability. *See, e.g., Lawless v. Steward Health Care Sys., supra* ("This provision 'impose[s]

strict liability on employers,' who must 'suffer the consequences' of non-compliance regardless of their intent.").

In sum, c. 149, §§148 and 150 imposes strict liability on Defendants and, as such, Defendants Motion for Summary Judgment on the Wage Act claims should be denied; and, conversely, Plaintiff Anderson's Motion for Summary judgment should be granted and the Honorable Court should award the employees treble damages and grant them their attorneys' fees and costs.

**Martin Sports is Liable for its Delinquent Plan Contributions.**

There is no dispute that Martin Sports was obligated under its contract with Local 11 to make contributions to Pension Fund of Local No. 11, I.A.T.S.E.; and International Alliance of Stage Employees Local 11 Section 401(k) Plan; and IATSE Local 11 Joint Apprentice Committee Educational Fund relating to the work performed by the Local 11-referred employees; that Martin Sports failed to make those contributions; and those contributions, ultimately, were made by ART Payroll on June 20 and 27, 2019, from funds provided by Local 11. While these facts are undisputed, Martin Sports nevertheless has moved for summary judgment arguing without citation to any authority that, since the contributions were made, albeit from Local, it is entitled to summary judgment.  As detailed below, Martin Sport's argument is unpersuasive.

In this regard, ERISA Section 515, 29 U.S. Code §1145, states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

In somewhat analogous circumstances, courts have refused to permit employers to offset contributions they owed to ERISA funds based on benefits they provided to employer-sponsored plans. For example, in *Line Construction Benefit Fund v. Big Sky Locators, Inc.*, 2003 U.S. Dist.

LEXIS 11104 (N.D. Il. 2003), the court rejected the employer's offset argument, holding as

follows:

> Big Sky also argues that it should receive a set-off for the amounts it paid to set up
> alternative medical insurance for its employees starting January 1, 2002. Based on its belief
> that all of its workers were non-bargaining unit employees (as none were Union members
> as of October 2001), and the fact that the Participation Agreement expired at the end of
> December 2001, Big Sky secured alternative medical insurance for its employees through
> Humana Insurance Company. It has offered evidence that it paid insurance premiums of
> $14,782.46 covering at least part of the relevant period. …
>
> The general rule is that an employer that fails to make required contributions to a fund
> cannot avoid that obligation by setting up some other benefit for its employees. *See Roofers
> Local Union No. 81 v. Wedge Roofing, Inc.*, 811 F. Supp. 1398, 1401 (N.D. Cal.1992);
> *O'Hare v. General Marine Transport Corp.*, 564 F. Supp. 1064, 1072 (S.D.N.Y. 1983);
> *Local 9, International Union of Operating Engineers, AFL-CIO v. Siegrist Construction
> Co.*, 458 F.2d 1313, 1316 (10th Cir. 1972). When an employer fails to make required
> contributions to a multi-employer health and welfare fund, all of the employees covered by
> that fund suffer, or are at least placed at risk. "The fact that an employer has provided some
> direct or other benefit to its employees does nothing to lessen the extent to which the fund
> is depleted." *Central States, Southeast and Southwest Areas Pension Fund v. Groesbeck
> Lumber & Supply, Inc.*, 2000 U.S. Dist. LEXIS 2183, No. 99 C 1447, 2000 WL 246249, at
> *4 (N.D. Ill. Feb. 24, 2000) (Kennelly, J.).

*See also Greenes v. Vijax Fuel Corp.*, 326 F. Supp. 2d 464, 466 & 468 (D. NY 2004) ("The CBA

included a so-called "most favored nation" clause, which provided that if Local 553 entered into

an agreement that 'permits the employment of its members under terms and conditions less

favorable to said members than are herein provided, the Employer [Vijax] shall have the right to

demand and receive said more favorable contract …' Defendants contend that Local 553 has an

agreement with non-party Petro, Inc. that provides Petro with 'less onerous conditions' than

those applied to Vijax. …   According to the defendants, the terms applied to Petro should apply

to Vijax by virtue of the CBA's most favored nations provision, and off-set any damages

assessed against Vijax in this action. … Because the proposed affirmative defense is not a

defense to liability, an amendment to assert it would be legally futile. Under the case law of this

Circuit and the language of ERISA, defendants' claimed damages offsets from the 'most favored nations' clause do not provide a defense against plaintiffs' ERISA claims.").

While decisions rejecting offset claims raised by employer that failed to make contributions required by their contracts are not directly "on point," they are instructive as they support the principle that, absent one of the three recognized defenses to ERISA delinquent collective suits,[4] an employer's obligation under ERISA Section 515 to make contributions is absolute. Stated another way, money paid by an employer cannot be used an offset, logic seemingly dictates that Martin Sports should not be able to offset its liability based on money paid by Local 11.

Accordingly, the Plaintiff ERISA fiduciaries respectfully suggest that Martin Sport remains obligated to make the contributions required under its contract with Local 11; and it should not be allowed to avoid its obligations because Local 11 provided funds to pay the Local 11-referred employees who worked for Martin Sports.

CONCLUSION.

For the reasons set out above and in Plaintiffs' cross motion for summary judgment, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion for Summary Judgment and grant their Motion for Summary Judgment.

---

[4] *Int'l Union of Operating Eng'rs Local 98 Health & Welfare Fund v. Bradway Constr., Inc*., 2015 U.S. Dist. LEXIS 134157 (D. Ma. 2015)

Section 515 contribution actions under ERISA are a special class of action for which "Congress intended to protect the Funds financial stability by limiting the scope of issues litigable when they seek to recover employers' contributions." *La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co*., 157 F.3d 404, 408 (5th Cir. 1998). Accordingly, "only three defenses to a delinquency action have been recognized by all of the circuit courts that have considered the issues: (1) the pension contributions are illegal, (2) the CBA is void ab initio, *e.g.* for fraud in the execution, and (3) the employees have voted to decertify the union as their bargaining representative." *Id*. All other claims are preempted.

For the Plaintiffs,
**COLLEEN GLYNN, CHRISTOPHER WELLING
AND DOUGLAS C. ANDERSON,**
By their Attorney,

/*Gabriel O. Dumont, Jr*./
Gabriel O. Dumont, Jr.
BBO#137820
**FEINBERG, DUMONT & BRENNAN**
177 Milk Street, Suite 300
Boston, MA 02109
(617) 338-1976
Cell (617) 733-4804
gd@fdb-law.com

March 28, 2022